CHAMBERS MEDICAL TECHNOLOGIES OF SOUTH CAROLINA, INC., Plaintiff,

v.

Michael D. JARRETT, as Commissioner of the South Carolina Department of Health and Environmental Control, and the South Carolina Department of Health and Environmental Control, Defendants.

Civ. A. No. 2:90–1360–8.

United States District Court, D. South Carolina, Charleston Division.

Jan. 19, 1994.

---

Bradford W. Wyche, Greenville, SC, for plaintiff.

Ellison D. Smith, IV, Charleston, SC, Samuel Leon Finklea, III, SC DHEC Office of General Counsel, T. Travis Medlock, J. Patrick Hudson, S.C. Atty. General's Office, Columbia, SC, for defendants.

## ORDER

BLATT, Senior District Judge.

### FINDINGS OF FACT/BACKGROUND

The plaintiff, Chambers Medical Technologies, challenges the constitutionality of several provisions of both the South Carolina Infectious Waste Management Act, S.C.Code Ann. §§ 44–93–10 *et seq.* ("the Act") and the regulations promulgated thereunder by the South Carolina Department of Health and Environmental Control ("DHEC"), Reg. 61–105. The original plaintiff in this case was Southland Exchange Joint Venture which owned a facility that incinerated medical, municipal solid and commercial non-hazardous waste in Hampton, South Carolina. On June 20, 1990, Southland instituted this action challenging two of the 1990 amendments to the Act that were to have taken effect on July 1, 1990: (1) an increase in the fees payable by a commercial waste facility from $18 per ton to $30 per ton for out-of-state medical waste and from $13 per ton to $25 per ton for in-state medical waste, S.C.Code Ann. § 44–93–160; and (2) the imposition of a 50 ton per day limit on the amount of medical waste that could be treated at any commercial medical waste facility, unless the amount of medical waste generated in South Carolina warranted a higher amount, S.C.Code Ann. § 44–93–210.

On June 26, 1990, this court granted Southland's preliminary injunction motion and enjoined the defendants from enforcing these two amendments to the Act. On May 16, 1991, Chambers acquired the facility from Southland. On November 25, 1991, this court granted Chambers' motion to be substituted for Southland as plaintiff herein and for leave to file an amended complaint. This case was tried before the court, sitting without a jury, on November 4 and 5, 1992. Proposed orders were filed by both parties on or about March 9, 1993.

In its amended complaint, Chambers challenges the following provisions of both the Act and the Regulation under the commerce clause, the equal protection clause and the due process clause of the United States Constitution: [1]

1. *The Blacklisting Provision*—§ 44–93–110
2. *The Demonstration of Need Provision*—§ 44–93–125, Reg. 61–105 V(1) and (3)
3. *The Fluctuating Treatment Cap,*—§ 44–93–210, Reg. 61–105 V(2)
4. *The Backhauling Provision,*—Reg. 61–105 Q(1)(h)
5. *The Refrigeration Rule,*—Reg. 61–105 K(5)
6. *Treatment Fees,*—§ 44–93–160
7. *Generator Fees*—Reg. 61–105 CC(2)
8. *Transporter Fees*—Reg. 61–105 CC(3)
9. *Permit Fee*—Reg. 61–105 CC(4) [2]

Chambers owns the only commercial facility in the state which incinerates infectious medical waste, although over 40 hospitals in the state currently incinerate their medical waste[3]. Tr. 228–29. More than 98% of the infectious waste treated at the facility by Chambers comes from outside the State of South Carolina. Tr. 38–39. Chambers' customers include over 2,000 individual generators, most of whom send medical waste to the facility through brokers. Tr. 234. The infectious waste handled at the facility consists primarily of bandages, bedding, dressing gowns and empty intravenous bottles. Tr. 29. A small portion of infectious waste consists of sharps (needles), blood products and pathological waste. Tr. 29–30; 256. During its ownership of the facility, Southland had problems associated with receiving leaking containers of medical waste. Chambers,

however, has reduced the number of leaking containers to one-tenth of one percent of all shipments (one container for every 1000). Tr. 129.

All waste products contain microorganisms, a few of which are "infectious", or capable of causing disease or illness. For disease to occur, however, there must be a "portal of entry" whereby the microorganism can enter an individual's bloodstream. With the exception of tuberculosis and chicken pox, breathing is not a "portal of entry" for any infectious microorganisms. Most microorganisms gain entry only by actually being injected into, or ingested by, the individual. Tr. 259–60. Household waste contains an average of 100 times as many infectious microorganisms as medical waste. Tr. 260. Most microorganisms quickly die upon being subjected to temperatures of 200 to 300 degrees fahrenheit. There is no evidence that any microorganism can survive temperatures of 1000 degrees Fahrenheit. Tr. 262. Waste in the facility's primary chamber, where incineration takes place, is subjected to a temperature of 1,600 degrees Fahrenheit for approximately six and one-half hours. Tr. 124. There is no evidence that a member of the public or any waste industry worker has ever acquired an infection from medical waste. Tr. 247–48; 260–61.

There is no dispute that this country is experiencing vast problems with waste disposal. Waste flow is increasing at a rapid rate while available landfill space is decreasing because of the unattractive nature of, and the risks associated with, landfills. States which provide waste disposal at a lower cost have experienced a great increase in out-of-state waste being brought into their states. South Carolina, like other states, has at-

---

**1.** Chambers' amended complaint also challenges certain provisions of the Act and the Regulation under South Carolina law. First, Chambers alleges that Sections 44–93–160, 44–93–170, 44–93–210 and 44–93–240 were part of the General Appropriations Act but do not reasonably and inherently relate to the raising and spending of tax monies, in violation of Article III, Section 17 of the South Carolina Constitution. Second, Chambers alleges that DHEC lacks the statutory authority to promulgate, administer and enforce Sections F(7), O(2) and CC of the regulations. Because these claims raise complex issues of

state law, this court, in its discretion, declines jurisdiction to decide them. *See* 28 U.S.C. § 1367(c)(1). Chambers is free to pursue these claims in state court.

**2.** Each provision is set out within the section of this order in which it is discussed.

**3.** For purposes of this order the terms "medical" and "infectious" waste are synonymous as defined in the Regulation.

tempted to deal with this influx of out-of-state waste with legislation which discourages out-of-state waste. While this court acknowledges South Carolina's plight in trying to protect the health and safety of the environment and its citizens, legislation which violates the commerce clause must be declared unconstitutional. It is not unconstitutional for South Carolina to regulate the total volume of waste being disposed of in South Carolina; however, it must be achieved through means which do not discriminate against out-of-state waste. *See Chemical Waste Management, Inc. v. Hunt,* — U.S. —, —, 112 S.Ct. 2009, 2015, 119 L.Ed.2d 121 (1992).

### ANALYSIS

█ As a threshold matter, the defendants contend that the plaintiff lacks standing to challenge three of the provisions in question: the generator fees, the blacklisting provision and the demonstration of need requirement. As enumerated in *Lujan v. Defenders of Wildlife,* — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), the Supreme Court has established that the constitutional minimum for standing must contain three elements: first, the plaintiff must have suffered an "injury in fact"—an invasion of a legally-protected interest which is concrete and particularized[4], *Allen v. Wright,* 468 U.S. 737, 756, 104 S.Ct. 3315, 3327, 82 L.Ed.2d 556 (1984); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club v. Morton,* 405 U.S. 727, 740–741, n. 16, 92 S.Ct. 1361, 1368–1369, n. 16, 31 L.Ed.2d 636 (1972) and is "actual and imminent, not 'conjectural' or 'hypothetical,'" *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1984). Second, there must be a causal connection between the injury and the challenged conduct. The injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... [the] result [of] the independent action of

some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976). Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Id.,* at 38, 43, 96 S.Ct. at 1924, 1926. The party invoking federal jurisdiction bears the burden of establishing these elements. See *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990).

█ The defendants contend that plaintiff lacks standing to challenge the "blacklisting" provision, S.C.Code Ann. § 44–93–110[5], because there has been no showing that any state has been blacklisted nor has plaintiff shown that it accepts waste from any blacklisted state. Chambers counters that even if no state is currently blacklisted, it will have to incur expenses to monitor the laws of all of the states from which it receives medical waste to ensure that none of them at any time ever bans the treatment or disposal of medical wastes. Plaintiff has not yet suffered an actual injury; however actual injury need not be shown; the mere risk of future injury is a sufficient "injury in fact" to support standing; thus, it is enough for standing purposes to show only a "threatened" injury. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). This court finds that the plaintiff has alleged a sufficient injury in fact in light of § 44–93–150, which provides the South Carolina Department of Health and Environmental Control (DHEC) with the authority to impose a civil penalty of up to $10,000.00 per day for any violation of the act or a regulation promulgated thereunder. As a result, the court concludes that the plaintiff is faced with sufficient threat of injury adequate to meet the standing requirements necessary to challenge the "blacklisting" provision.

---

4. By particularized the Supreme Court means that the injury must affect the plaintiff in a "personal and individual way." *Lujan v. Defenders of Wildlife,* — U.S. —, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

5. § 44–93–110 states: It is unlawful for a person who owns or operates a waste treatment, storage, or disposal facility within this State to accept any infectious waste generated in a jurisdiction which prohibits by law the treatment, storage, or disposal of that infectious waste within that jurisdiction.

■ The defendants next contend that plaintiff lacks standing to challenge the "generator fees" [6] imposed by Reg. 61–105 CC(2), because the plaintiff is not a generator of medical waste. The plaintiffs contend that generators usually demand from treatment facilities, such as the plaintiff, a "turnkey" contract covering the collection, transportation, treatment and disposal of medical waste, much like an individual requires from his or her private garbage disposal company. Plaintiff argues that the fee aimed at generators directly affects the plaintiff and that the plaintiff has a "personal stake" in litigating these fees. In *Government Suppliers Consolidating Services, Inc. v. Bayh*, 975 F.2d 1267 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 977, 122 L.Ed.2d 131 (1993), the defendants questioned the standing of waste brokers to challenge regulations affecting transporters whose contracts to transport were arranged by the brokers. The Seventh Circuit rejected the defendants' arguments, finding that the brokers had standing be-

cause "[i]t is undisputed that their business would suffer severe adverse effects from the enforcement of the backhaul ban. Such economic injury, though indirect, is sufficient to confer standing." *See also Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 320–21 n. 3, 97 S.Ct. 599, 602–03 n. 3, 50 L.Ed.2d 514 (1977) (standing found where stock exchanges outside New York suffered injury when their members were subjected to a discriminatory tax which "diverted business from their facilities in New York"). Since it is clear that the plaintiff's business would suffer sufficient adverse effects from the enforcement of the "generator fees", this court finds that the plaintiff has standing to challenge the "generator fees" imposed by Section CC(2) of the regulations.

■ Lastly, the defendants contend that the plaintiff lacks standing to challenge the demonstration of need provisions, S.C.Code Ann. § 44–93–125 [7] & Reg. 61–105 V(1) & (3) [8]. The defendants argue that the plain-

6. CC(2) states:
 (a) *Generators who dispose of infectious waste at an off-site permitted treatment facility in this State must apply for authorization for treatment and pay a fee according to the estimated amount to be disposed for the year. If a generator exceeds the specific authorized amount, the generator must pay the appropriate fee in addition to the amount initially paid. No credits will be given for amounts authorized, but unused.*
 (b) Fees for generators are:

| Amount (in tons per year) | FEE (in $s) |
|---|---|
| in-state small quantity generators | No fee |
| Less than 0.3 | 25 |
| 0.3–99 | 100 |
| 100–249 | 250 |
| 250–499 | 500 |
| 500–999 | 1000 |
| 1000–1500 | 1500 |
| Greater than 1500 | 1500 + $5 per ton in excess of 1500 tons per year |

7. § 44–93–125 states: No person may expand or construct a new facility without a permit issued by the department. To obtain a permit, the *applicant shall demonstrate the need for a facility* or expansion. To determine if there is a need, infectious waste generated out-of-state may not be considered without department approval.
 This section does not apply to:
 (1) facilities owned by counties, municipalities, or public service districts which accept only infectious waste generated in this State:

(2) facilities that are owned or operated by the generator of the waste and this waste is generated in this State;
(3) generator facilities; or
(4) facilities currently operating under permits issued by the department, or to the renewal of existing permits issued by the department if there is no expansion of the capacity as prescribed in the conditions of the permit.

8. Reg. 61–105 V states:

 (1) No person may expand or construct a new facility without a permit issued by the Bureau of Solid and Hazardous Waste Management (or succeeding Bureau). To obtain a permit, the applicant shall demonstrate the need for such a facility or expansion. To determine if there is a need, infectious waste generated outside of the state may not be considered without Department approval.
 (3) The demonstration of need does not apply to:
 (a) facilities owned by counties, municipalities, or public service districts which accept only infectious waste generated in this State;
 (b) facilities that are owned or operated by the generator of the waste and this waste is generated in this State;
 (c) generator facilities; or
 (d) facilities currently operating under permits issued by the department, or to the renewal of existing permits issued by the department if there is no expansion of the capacity as prescribed in the conditions of the permit.

tiff's injury is too speculative to meet the requirements of standing because plaintiff did not present any testimony proving that it had applied for a permit to expand. Further, the regulation provides that in determining whether there is a need, infectious waste generated outside of the state may not be considered without DHEC approval; thus, the defendants contend that there is a chance that the Department would allow out-of-state waste to be considered. To assume that the plaintiff has applied for a permit to expand and to further assume that DHEC has not allowed the plaintiff to include out-of-state waste in determining need is to engage in mere speculation. Therefore, the court finds that this issue is not ripe for consideration at this time and "standing" on this issue is lacking.

■■■ The commerce clause [9] "directly limits the power of the States to discriminate against interstate commerce." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273, 108 S.Ct. 1803, 1807, 100 L.Ed.2d 302 (1988). The negative or dormant aspect of the commerce clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Hazardous Waste Treatment Council v. South Carolina,* 945 F.2d 781, 789 (4th Cir.1991) quoting *New Energy,* 486 U.S. at 273–74, 108 S.Ct. at 1807–08. Thus, the commerce clause is a "restriction on permissible state regulation" of interstate commerce. *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). If the challenged statute "clearly discriminate[s] against interstate commerce," *New Energy Co.,* 486 U.S. at 274, 108 S.Ct. at 1807, the court must strike it down, "unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *Id.* at 274, 108 S.Ct. at 1808.

The Constitution "was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 55 S.Ct. 497, 79

L.Ed. 1032 (1935). This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949). As a result, the Supreme Court has concluded that "what is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation." *Baldwin,* 294 U.S. at 527, 55 S.Ct. at 502.

[8] In *City of Philadelphia v. New Jersey,* 437 U.S. 617, 623–24, 98 S.Ct. 2531, 2535–36, 57 L.Ed.2d 475 (1978), the Court noted that Supreme Court opinions throughout the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a state legislates to safeguard the health and safety of its people. The Supreme Court has developed a two-tiered approach to commerce clause cases. When the challenged statute clearly discriminates against interstate commerce, the burden shifts to the State to demonstrate that the statute addresses concerns that cannot adequately be served by nondiscriminatory alternatives. *Fort Gratiot Landfill v. Mich. Dept. of Nat. Res.,* —— U.S. ——, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992). Justifying discrimination is difficult to say the least. The Supreme Court's acceptance of such discrimination has been focused on commerce bearing the threat of death or disease. *Hazardous Waste,* 945 F.2d 781, 790 citing *Maine v. Taylor,* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (upholding Indiana's prohibition on importing dead animals because of the potential for disease). When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, the Court has examined the statute to determine whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. *Pike v. Bruce Church, Inc.*

---

**9.** "Congress shall have the Power ... [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const., Art. 1, § 8, cl. 3.

397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). The Court has also recognized that there is no clear line indicating the category of state regulation that is virtually per se invalid under the commerce clause, and the category subject to the *Pike v. Bruce Church* balancing approach; "[i]n either situation, the critical consideration is the overall effect of the statute on both local and interstate activity." *City of Philadelphia*, 437 U.S. at 579, 98 S.Ct. at 2519; See *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978). The crucial inquiry is whether the statute is basically a protectionist measure or whether the statute is based on legitimate local concerns with effects on interstate commerce that are only incidental. *Pike*, 397 U.S. at 624, 90 S.Ct. at 1331.

 The plaintiff has challenged several provisions of the Infectious Waste Management Act.[10] These provisions will be discussed separately. The first provision challenged by the plaintiff is S.C.Code Ann. § 44–93–110[11] which is referred to as the "blacklisting" provision. The provision prohibits the owner or operator of any waste treatment, storage, or disposal facility within the state of South Carolina from accepting any medical waste generated in a jurisdiction that prohibits the treatment, storage, or disposal of medical waste within that jurisdiction.

The U.S. Court of Appeals for the Eleventh Circuit held a similar statute which regulated hazardous waste to be violative of the commerce clause in *National Solid Wastes Mgmt. Assoc. v. Alabama Department of Environmental Mgmt.*, 910 F.2d 713 (11th Cir.1990), *mod., reh. denied*, 924 F.2d 1001 (11th Cir.), *reh. denied en banc*, 932 F.2d 979 (11th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991). The Alabama statute barred the acceptance

of waste from states that either prohibited in-state disposal or treatment of the waste or had not signed an interstate or regional agreement to which Alabama was a party. The Circuit Court reversed the District Court which had determined that the statute was constitutional under the *Pike* balancing test. The Eleventh Circuit ruled that the Alabama statute, on its face, discriminated against out-of-state waste generators and imposed on these generators the burden of conserving Alabama's remaining hazardous waste disposal capacity. The Circuit Court rejected the District Court's reasoning that Alabama was not hoarding its disposal capacity by closing its borders to only certain states. The Eleventh Circuit also rejected Alabama's argument that the discrimination was justified because the concerns addressed by the statute could not be served by nondiscriminatory alternatives. First, the court determined that the statute was not required for Alabama to comply with SARA[12] capacity assurance requirements because Alabama had available nondiscriminatory alternatives which would allow it to comply. Second, the court held that Alabama's statute did not reduce the likelihood of accidents and risk to its citizens and environment because the statute distinguished among wastes based on their origin with no other grounds for the distinction. The plaintiff had presented evidence that the types of waste accepted at the facility did not vary based upon the states in which the wastes were generated. The Eleventh Circuit Court held that Alabama had attempted to "isolate itself from a problem common to many by erecting a barrier, against the movement of interstate trade." Id. at 720 citing *City of Philadelphia*, 437 U.S. at 628, 98 S.Ct. at 2538.

The Fourth Circuit Court of Appeals in *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781, 789 (4th Cir. 1991), dealt with a statute similar to the

---

**10.** The Supreme Court in *City of Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978) concluded that waste is an object of commerce.

**11.** § 44–93–110 states: It is unlawful for a person who owns or operates a waste treatment, storage, or disposal facility within this State to accept any infectious waste generated in a juris-

diction which prohibits by law the treatment, storage, or disposal of that infectious waste within that jurisdiction.

**12.** SARA is the acronym for the Superfund Amendments and Reauthorization Act, Pub.L. 99–499. 100 Stat. 1613 (codified in scattered sections of 10, 26 & 42 U.S.C.).

Alabama statute. In *Hazardous Waste*, the State of South Carolina appealed the grant of a preliminary injunction by the District Court. The Fourth Circuit reexamined the plaintiff's likelihood of success to decide whether the plaintiff had shown grave or serious questions for litigation. One of the challenged provisions prohibited "any person who owns or operates a waste treatment facility within [South Carolina] from accepting any hazardous waste generated in any jurisdiction which prohibits ... the treatment of that hazardous waste within that jurisdiction ..." Id. at 785. The Fourth Circuit held that because the South Carolina blacklisting statute appeared to facially discriminate against out-of-state hazardous waste, the *Pike* balancing analysis did not apply. The Fourth Circuit noted a marked resemblance to the Alabama statute struck down in *National Solid Wastes Mgmt. Assoc.* and held that the reasons advanced for South Carolina's law were insufficient because that law did not seem driven by concerns over other states' inferior standards which may jeopardize South Carolina's citizens' health. 945 F.2d at 791. The court further stated that South Carolina's Act punished certain hazardous waste generators because they were located in states that South Carolina concluded had not fulfilled their obligations under CERCLA[13], and it noted that South Carolina was not empowered to place penalties on businesses in such states. The court determined that South Carolina could not penalize its citizens by prohibiting them from participating in interstate commerce with citizens of other states simply because those other states had not met its obligations under CERCLA.

Since S.C.Code Ann. § 44–93–110 (blacklisting provision) is similar to the statutes in the *National Solid Wastes Mgmt. Assoc.* and *Hazardous Waste* cases, this court finds that the *Pike* balancing test, discussed earlier, is inapplicable to S.C.Code Ann. § 44–93–110 because this statute directly discriminates on its face against interstate commerce. South Carolina's selective ban does not distinguish on the basis of type of waste or degree of dangerousness, but solely on the basis of the state of generation. *National Solid Wastes Mgmt. Assoc.*, 910 F.2d at 721.

South Carolina argues that the unregulated transportation, handling and disposal of medical waste poses risks to the public safety, health, and welfare of the citizens of this state. Even if South Carolina's purpose in enacting the statute was to address health and safety concerns of its citizens, that purpose may not be accomplished by discriminating against articles of commerce unless there is some reason, apart from their origin, to treat them differently. South Carolina argues that some other states have diseases which are not found in South Carolina, but the testimony presented by the plaintiff revealed that the types of waste accepted by the plaintiff did not vary based upon the states in which the wastes were generated. This court finds that the blacklisting provision is a protectionist measure, not based adequately on a legitimate local concern, and is, therefore, unconstitutional.

■ The next provisions which the plaintiff challenges are § 44–93–210[14] and Reg. 61–105 V(2),[15] which are also referred to as

---

**13.** CERCLA is the acronym for the Comprehensive Environmental Response, Compensation, and Liability Act found at 42 U.S.C. §§ 9601–75. It is also known as the "Superfund" act.

**14.** § 44–93–210 states:

(A) Beginning November 1, 1990, and annually thereafter, the department shall estimate and publish the amount of infectious waste it expects to be generated within this State during the succeeding calendar year. No permitted commercial infectious waste incinerator facility may burn more than one-twelfth of the annual estimate of infectious waste during any one month of the year to which the estimate applies. However, at no time may the limit on

the amount of infectious waste burned in a month be less than fifteen hundred tons.

(B) The limitation on the tonnage of infectious waste does not apply to infectious waste treated by hospitals or generator facilities if the waste is generated in this State and is incinerated on a nonprofit basis.

(C) For purposes of this section, a permitted commercial infectious waste incinerator facility means a site where infectious waste is incinerated regardless of the number of incinerator units or the ownership of the units.

**15.** Reg. 61–105V(2) states: The Department [DHEC] will determine and publish annually an estimate of the amount of infectious waste to be generated in South Carolina during the ensuing

the fluctuating treatment cap provisions. The state argues that the treatment cap is evenhanded because the statute imposes no restrictions on how much out-of-state waste can be handled at the facility (i.e., the plaintiff can incinerate 1,500 tons per month of nothing but out-of-state medical waste if it wishes). The plaintiff contends, that while this is true, the state's position is without merit because it ignores the true theory under which the cap is established. The plaintiffs insist that the cap is not 1,500 tons per month, but rather is the amount of medical waste generated within South Carolina, and that an evenhanded cap would simply provide that no medical waste facility could incinerate more than 1,500 tons of waste per month. Thus, plaintiff argues there is no "cap" at all on the total amount of in-state waste that may be incinerated in South Carolina, and that the only cap is on the amount of out-of-state waste that can be brought to and treated in the state.

The cap is somewhat unusual in that it provides what may be described as a floor for the cap (i.e., at no time can the limit on the amount of infectious waste burned in a month be less than 1500 tons). The cap can fluctuate above 1500 tons, but the cap can never fluctuate below 1500 tons. Therefore, the cap has a potential to increase above 1500 tons if DHEC's annual estimate of infectious waste to be generated in South Carolina during the succeeding 12 months exceeds 18,000 tons—(1500 × 12)—because an estimate of more than 18,000 tons would produce a monthly amount higher than 1500 tons. The plaintiff argues that since the cap can only be increased if the level of in-state waste increases, the cap discriminates against out-of-state waste and that in creating a cap that fluctuates according to the amount of waste produced in South Carolina, it is evident that South Carolina's concern is not the total amount of waste that is incinerated, but rather the origin of that waste.

This court finds that the statute/regulation does not discriminate on its face against out-of-state waste. While the statute/regulation

requires that an annual cap be set, based on the amount of waste which will be generated in South Carolina during the ensuing twelve months, it does not place any restrictions on the disposal of the waste based on its origin. In other words, an incinerator can dispose of all in-state waste, all out-of-state waste, or a combination of both as long as the annual cap is not exceeded.

The Supreme Court has ruled that a state may apply an even-handed cap. *Chemical Waste Management, Inc. v. Hunt,* —— U.S. ——, ——, 112 S.Ct. 2009, 2015, 119 L.Ed.2d 121 (1992). The court in *City of Philadelphia,* 437 U.S. at 627–28, 98 S.Ct. at 2537–38, which found New Jersey's prohibition of solid waste from outside that state to amount to economic protectionism barred by the commerce clause, stated:

> [T]he evil of protectionism can reside in legislative means as well as legislative ends. Thus, it does not matter whether the ultimate aim of [C]h. 363 is to reduce the waste disposal costs of New Jersey residents or to save remaining open lands from pollution, for we assume New Jersey has every right to protect its residents pocketbooks as well as their environment. And it may be assumed as well that New Jersey may pursue those ends by slowing the flow of *all* waste into the state's remaining landfills, even though interstate commerce may incidentally be affected. But whatever New Jersey's ultimate purpose, it may not be accompanied by discriminating against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently. Both on its face and in plain effect, [C]h. 363 violates this principle of nondiscrimination.

This court finds that the cap established by the defendants applies evenhandedly to both in-state and out-of-state waste. The fact that the cap is based on an estimate of the amount of waste to be generated in South Carolina in the ensuing twelve months does not change the analysis. Once the cap is established in November of each year, its

twelve months. During any one calendar month no permitted waste treatment facility shall treat or dispose of more than the lesser of 1500 tons

or one-twelfth of the published estimated amount.

application does not discriminate against out-of-state waste. Thus, since the cap regulates evenhandedly, the statute/regulation is subject to the *Pike* balancing test.

South Carolina contends that the concerns addressed by the provisions involve: disruption of traffic flow in the area of the plaintiff's facility, leaking trailers, and the deposit of unincinerated material in the landfill. South Carolina argues that the statute/regulation addresses these concerns by decreasing the sheer volume of waste. This court finds that these are legitimate state interests and the local benefits clearly exceed any indirect effects on interstate commerce. Therefore this court finds that the cap is constitutional.

■ Since this court has ruled that the cap does not violate the commerce clause, it must address the plaintiff's alternative argument that the cap violates the equal protection clause. The plaintiff argues that the statute/regulation creates two classifications: (1) incinerators v. non-incinerators, and (2) commercial v. non-commercial facilities. Both parties agree that because the cap does not involve a suspect class, such as race, nor a fundamental right, such as free speech, the proper test to determine whether the cap violates the equal protection clause is the more lenient "rational relationship test". The cap must be rationally related to a legitimate state interest. *Bankers Life and Casualty Co. v. Crenshaw,* 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988). "Under that standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Exxon Corp. v. Eagerton,* 462 U.S. 176, 196, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). "[L]egislatures have especially broad latitude in creating classifications and distinctions in state statutes." *Id.*

The defendants argue that the cap was passed in order to address the numerous complaints about the operation of the plaintiff's facility, including: a disruption in traffic flow caused by tractor trailer trucks in line on the highway leading to the facility, some of which were leaking bloody fluid; and unburned human and animal body parts which were discovered in the Hampton County landfill. The defendants argue that the cap addresses these concerns by reducing the sheer volume of waste and applies to commercial incinerators because non-commercial and/or other types of waste disposal facilities [16] have not had these same problems which have only been associated with commercial incinerators.

Finding that the concerns addressed by the cap are legitimate because credible evidence revealed that the plaintiff or its predecessor allowed tractor trailers, which were at times leaking blood, to be lined up on the highway leading to the plaintiff's facility and deposited unburned animal and human body parts in the landfill. In addition, there was no evidence that these problems have been associated with any other method of infectious waste disposal or any noncommercial facility. Since the "rational relationship" test is very lenient, this court finds that the statute is rationally related to the concerns it addresses. Reducing the amount of waste the commercial incinerators burn is a rational way to reduce the problems. Whether this court feels that the cap is the best way to address the problem does not matter. As long as the cap is rationally related to a legitimate state interest, this court must uphold the statute on equal protection grounds. Finding that the cap is rationally related to a legitimate state interest, this court finds that the cap is constitutional.[17]

---

16. § 44–93–80(B) provides as follows:

(B) Infectious waste must be treated as soon as practicable by one of the following treatment methods:

(1) incineration;

(2) steam sterilization;

(3) chemical disinfectant;

(4) any other department-approved treatment method.

17. Although weakly advanced and briefly argued, the plaintiff also challenges the constitutionality of the cap on due process grounds. The plaintiff claims that the due process clause requires that a state law be rationally related to a legitimate state objective. In its discussion of plaintiff's equal protection challenge to the cap, this court determined that the cap is rationally related to a legitimate state objective, therefore, the cap

The next challenged regulation is Reg. 61–105 Q(1)(h) [18], also referred to as the "backhauling prohibition". Reg. 61–105 Q(1)(h) requires that vehicles used to transport, store or otherwise manage medical waste must be used exclusively for that purpose. This provision effectively prevents transporters delivering medical waste to an in-state facility from carrying any other cargo; the transporters would have to make one leg of the trip with an empty truck, thus doubling the cost of delivering medical waste to the facility. Tr. 112. On its face, the backhauling prohibition appears to regulate evenhandedly because it does not contain language that discriminates between in-state and out-of-state interests. However, a determination that a regulation does not discriminate on its face and purports to regulate evenhandedly does not end the question of the type of scrutiny which must be applied. When a regulation discriminates in practical effect against interstate commerce, the fact that it purports to apply equally to citizens of all states does not save it. *Government Suppliers Consolidating Serv. v. Bayh*, 975 F.2d 1267, 1277 (7th Cir.1992). Therefore, to determine what level of scrutiny to apply to this regulation, this court must examine the practical effect of the regulation on interstate commerce. As the Supreme Court has noted, the "critical consideration is the overall effect of the statute on both local and interstate activity." *Brown–Forman Distillers Corporation v. New York State Liquor Authority*, 476 U.S. 573, 578, 106 S.Ct. 2080, 2084, 90 L.Ed.2d 552 (1986). In *Government Suppliers*, the Seventh Circuit analyzed a similar Indiana regulation [19] and held that the practical impact of the backhaul ban would be to reduce very significantly the inflow of out-of-state waste by raising the cost of disposing of such waste in Indiana. Citing, *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 351, 97 S.Ct.

2434, 2445, 53 L.Ed.2d 383 (1977), the Seventh Circuit stated that discrimination may take the form of "raising the costs of doing business" for out-of-state entities, "while leaving those of their [in-state] counterparts unaffected." *Government Suppliers*, at 1279.

In *Government Suppliers*, the court noted that Indiana waste was usually transported in dedicated garbage trucks and thus intrastate waste transporters were unaffected by the backhaul prohibition. At this time, the plaintiff owns the only commercial medical waste facility in South Carolina and slightly over 1% of infectious waste received at the facility is generated in South Carolina. There was no testimony that the intrastate transport of infectious waste was accomplished only through use of dedicated trucks in South Carolina. While it appears that the regulation is nondiscriminatory, when the fact is considered that between 98–99% of the infectious waste received at the facility is generated out-of-state, the practical discriminatory effects of the regulation are brought to light. As in *Government Suppliers*, the practical impact of the backhaul ban is to reduce very significantly the inflow of out-of-state waste. Thus, the statute is subject to strict scrutiny, shifting the burden to the state to prove that such discrimination is justified because the concerns addressed by the statute can not be served by nondiscriminatory alternatives.

The defendants claim that the backhaul ban serves substantial health and safety concerns and was adopted in response to the concerns of South Carolina producers and vendors whose products were being shipped out-of-state in trailers that had brought infectious waste to the plaintiff's facility. The defendants claim that the regulation prevents the risk of contamination of products carried in trucks that have previously hauled infec-

---

would also be constitutional under the due process clause.

**18.** Reg. 61–105(Q)(1)h states: Vehicles used to transport, store, or otherwise manage infectious waste must be used exclusively for the purpose of waste transport and are not allowed to be used for any other purpose except to store materials used in conjunction with the transportation of infectious waste.

**19.** The Indiana backhauling prohibition was less restrictive than the South Carolina rule—it allowed vehicles that carried waste to also carry such items as wood, concrete, and brick. 975 F.2d at 1270. Those items are not allowed under South Carolina's backhauling prohibition.

tious waste, but little evidence was produced which proved that health risks are actually posed by the practice of crosshauling. Additionally, the defendants did not demonstrate that such risks, if they do exist, could not be avoided by less discriminatory means. In fact, Mr. Morris of DHEC agreed that if a trailer was properly disinfected, which the regulations require, there would be no public health problem with the practice of crosshauling. Tr. 244–45. The plaintiff's expert, Dr. Rutalla agreed with this view, except he felt that if the products being crosshauled were foodstuffs, they should be containerized even if transported in a decontaminated truck. Based on this evidence, this court finds that less discriminatory means exist to address the health and safety concerns of the state, (i.e., enforcement of the disinfection regulation and requiring that foodstuffs be containerized).

As stated earlier, another interest the defendants claim is addressed by the regulation is the protection of the reputation of the products, of South Carolina producers and vendors, which were being shipped out-of-state in trailers that had brought infectious waste to the plaintiff's facility. This same interest was discussed in *Government Suppliers* at 1280. Indiana claimed that its statute protected the commercial reputation of the state, (i.e., the producers and vendors) and argued that the backhaul ban was necessary to protect the reputation of these products, even if there was no health risk whatsoever. The Seventh Circuit held that such an interest in catering to consumer preferences is hardly deserving of the same deference that would be owed to significant health and safety concerns. *Government Suppliers* at 1280. This court agrees with the Seventh Circuit view and finds that South Carolina's interest in protecting the commercial reputation of its goods is not an adequate basis for discrimination. Therefore, this court finds that the backhaul provision is a protectionist measure not adequately based on a legitimate local concern, and is, therefore, unconstitutional.

This court also notes that the same result would be reached under the less deferential test of *Pike*. The burden on interstate commerce of doubling the cost of transporting waste outweighs the benefits of the prohibition. As noted above, South Carolina's asserted health concerns are actually an interest in its commercial reputation; and, in serving its interests in its commercial reputation, South Carolina, like Indiana, is bowing to unreasoned public opinion. *Government Suppliers* at 1286.

The next challenged provision is Reg. 61–105K(5) [20], which is also referred to as the "refrigeration rule." Section K(5) of the Regulation imposes refrigeration requirements on the storage and transportation of infectious waste. This court has considered the storage and transportation requirements separately.

First, the transportation requirement listed in K(5)(d) regulates evenhandedly on its face, but discriminates in practical effect by significantly reducing the inflow of out-of-state waste by raising the cost of disposing of such waste in South Carolina. For example, the plaintiff established at trial the

---

**20.** Reg. 61–105(K)5 states:

Infectious waste must be maintained in a nonputrescent state using refrigeration when necessary.

(a) Generator on-site storage for quantities of no more than fifty (50) pounds shall not exceed fourteen (14) days without refrigeration and thirty (30) days if maintained at or below 42 degrees Fahrenheit.

(b) Multi-practice offices must meet the quantity limits cumulatively if using the same outside storage areas.

(c) Generator on-site storage for quantities of more than 50 pounds shall not exceed ninety-six (96) hours without refrigeration and thirty (30) days if maintained at or below 42 degrees Fahrenheit.

(d) Once infectious waste leaves the generator site, the waste shall not exceed twenty-four hours at ambient temperature or 96 hours below 42 degrees Fahrenheit before delivery to a permitted treatment facility.

(e) Once infectious waste is stored in a refrigerated or frozen state by a generator, an intermediate handling facility operator, a transfer facility operator, or a transporter, the waste shall be maintained in that refrigerated or frozen state until treatment at a permitted treatment facility.

(f) Treatment facilities must store infectious waste below 42 degrees Fahrenheit and cannot store this waste in excess of forty-eight (48) hours.

difficulty of collecting infectious waste in the northeast and delivering it to the South Carolina facility in less than 24 hours. The plaintiff also established that the cost of transportation by refrigerated trucks is significantly higher than using unrefrigerated trucks. Since intrastate transporters are not affected because refrigeration is not required for the first 24 hours from the time the waste leaves the generator site, the provision is therefore subject to the higher level of scrutiny, and the burden shifts to the defendants to prove that this discrimination is justified because the concerns addressed by the regulation can not be served by nondiscriminatory alternatives.

The defendants claim that the refrigeration rule serves substantial health and safety concerns. The defendants offered testimony that refrigeration of waste kills certain pathogens, retards the growth and multiplication of other pathogens, and reduces the odor associated with infectious wastes. The plaintiff offered testimony that cold temperatures essentially promote viability of microorganisms. The plaintiff's expert testified that ambient temperatures actually promote a natural destruction of the microorganisms, Tr. 267, but he did not state that there would not be an odor associated with this natural destruction. Therefore this court finds that refrigeration does aid in the control of odors which, in this court's opinion, is a legitimate state concern.

The next question facing the court is whether the odor control can be achieved by nondiscriminatory alternatives. The evidence submitted by the defendants indicated that in August, 1991, there were problems with odors because the waste remained at the facility for an extended period of time, was unrefrigerated, and was exposed to high temperatures. Tr. 196. This court finds that one nondiscriminatory method in which odors can be controlled would be to regulate the extent of the period of time and the method by which the waste is stored without making a distinction based on the origin of waste. Therefore, this court has determined that the refrigeration requirement as to

transportation listed in K(5)(d) is unconstitutional because less discriminatory means are available to accomplish the same result.

■■■ This court finds that the storage refrigeration requirements listed in Reg. K(5)(a), (c) & (f) regulate evenhandedly on their face, but discriminate in practical effect by significantly reducing the inflow of out-of-state waste by raising the cost of disposing of such waste in South Carolina. The provisions differentiate between on-site and off-site storage. Off-site treatment facilities must store infectious waste below 42 degrees fahrenheit and cannot store this waste in excess of 48 hours, while on-site generators can store no more than 50 pounds of waste for 14 days without refrigeration, and for 30 days if maintained at or below 42 degrees fahrenheit. On-site generators, too, can store more than 50 pounds of waste for 96 hours without refrigeration, and for 30 days if maintained at or below 42 degrees fahrenheit. As stated earlier in this order, 98–99% of the waste disposed of off-site is generated out-of-state. Therefore, by drawing a distinction between off and on-site facilities, the storage regulations impose more harsh and costly restrictions on out-of-state waste and are thus subject to a higher level of scrutiny.

Once again, the defendants claim that the refrigeration storage requirement aids in the control of odors. This court has heretofore held that this is a legitimate state concern, raising the issue of whether odor control can be achieved by nondiscriminatory alternatives. One nondiscriminatory alternative would be to regulate the storage of waste without reference to origin (i.e., in this case without reference to whether waste is stored on or off-site). Another alternative would be to distinguish as to the amount and not the origin of waste. Therefore, this court finds that the refrigeration requirements as to storage listed in Reg. 61–105(k)(5)(a), (c) & (f) are unconstitutional because less discriminatory means are available to accomplish the same result.

■■■ The next challenged provision is S.C.Code Ann. § 44–93–160 [21] which imposes

21. § 44–93–160 states:

(A) There is imposed a fee on the commercial treatment of infectious waste in this State

a fee on the commercial treatment of medical waste in South Carolina of $30 per ton for waste generated outside the State and $25 per ton for waste generated within the State. This statute clearly discriminates on its face against out-of-state waste and is subject to strict scrutiny with the burden shifting to the defendants to prove that the discrimination is justified because the concerns addressed by the statute could not be served by nondiscriminatory alternatives.

In the case of *Chemical Waste Management*, —— U.S. ——, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992), the United States Supreme Court considered a similar scheme. Alabama imposed a set per-ton fee on all hazardous waste and substances disposed of at commercial facilities within the State, and then imposed an "additional fee" for waste generated outside Alabama. *Id.* at ——, 112 S.Ct. at 2012. The Court noted that such treatment constituted facial discrimination, requiring the State to "justify it both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." —— U.S. at —— – ——, 112 S.Ct. at 2013–14.

Alabama asserted four local purposes including: the health and safety of its citizens; conservation of the State's environment and natural resources; provision for compensatory revenue for the additional costs of disposing of out-of-state wastes; and reducing the overall volume of wastes carried into and through the State. *Id.* at ——, 112 S.Ct. at 2014. The Supreme Court, however, found,

because there was no evidence that waste generated outside of Alabama was more dangerous than waste generated in-state, that the State's real concern focused on the volume of the waste entering the facility, and that less discriminatory means were available, such as a per-ton additional fee on all hazardous waste disposed of in Alabama, a per-mile tax on all vehicles transporting wastes, or an evenhanded cap on the total waste tonnage involved. Finding that the State of Alabama failed to meet its burden, the Supreme Court held the additional fee imposed on out-of-state waste was clearly impermissible under the commerce clause.

This court finds that the analysis employed in *Chemical Waste* is appropriate here because South Carolina's statute also imposes an additional fee for waste generated outside South Carolina. As is *Chemical Waste*, the statute clearly discriminates on its face against out-of-state waste and is subject to strict scrutiny, and once again the burden shifts to the defendants to prove that the discrimination is justified because the concerns addressed by the statute could not be addressed by nondiscriminatory alternatives. The defendants advance state interests that are similar to those advanced by Alabama. As discussed in *Chemical Waste*, one nondiscriminatory alternative available here would be to levy a per-ton additional fee on all infectious waste disposed of in South Carolina. Therefore, this court finds that the South Carolina statute, like the Alabama statute, is unconstitutional because it violates the commerce clause.[22]

equal to thirty dollars a ton on the pretreatment weight of infectious waste generated outside of this State and twenty-five dollars a ton on the pretreatment weight of infectious waste generated within this State.

Note: Sections B & C are reporting and penalty statutes respectively and are not germane to the analysis.

22. The defendants submitted a copy of *Gilliam County v. Department of Environmental Quality*, 316 Or. 99, 849 P.2d 500 (1993), in which the Supreme Court of Oregon upheld Oregon's imposition of a higher fee on the disposal of out-of-state solid waste than on the disposal of in-state waste. The U.S. Supreme Court granted certiorari on November 18, 1993, and oral arguments will be held on January 18, 1994. One of the issues to be addressed is the imposition of the

higher fee on out-of-state waste. Even if the decision as to this issue is affirmed, the case can still be distinguished from the case at hand. In *Gilliam*, the Oregon Supreme Court held that an express nexus existed between the additional fee on out-of-state waste and the extra costs incurred by the state in regulating the out-of-state waste. The Oregon statute directed their equivalent of DHEC ("the EQC") to base the additional fee on out-of-state waste on the additional amount it cost the state to regulate the out-of-state waste. The South Carolina statute does not establish a nexus between the additional fee on out-of-state waste and the extra costs incurred by the state in regulating out-of-state wastes. Further, the defendants have not presented any evidence which indicates that the additional fee is directly related to the additional costs incurred by the state. Therefore, even if the Supreme Court affirms the

South Carolina argues that even if the additional fee is invalid, only the discriminatory "excess portion" of the fee should be struck. South Carolina, in effect, requests that this court allow the $25 fee to be upheld as to all waste disposed of in South Carolina. The general rule is that courts do not rewrite a state law to conform it to meet constitutional standards. *Eubanks v. Wilkinson*, 937 F.2d 1118, 1122 (6th Cir.1991) citing *Virginia v. American Booksellers Assoc.*, 484 U.S. 383, 397, 108 S.Ct. 636, 645, 98 L.Ed.2d 782 (1988). In order to correct Section 44–93–160 to make it constitutional, this court would have to substantially rewrite the statute. This court feels that the South Carolina General Assembly should have the opportunity to determine which method of correction is best for South Carolina. For example, South Carolina may choose to implement a higher fee on all waste than the fee currently contained in the statute. Having concluded that it is not appropriate for it to surmise how the South Carolina legislature might correct this statute, this court finds it to be more appropriate to declare § 44–93–160 unconstitutional.

The next challenged provision is Reg. 61–105 CC(2)[23], which imposes fees on generators of infectious waste who dispose of the waste at an off-site permitted treatment facility. The defendants stress that these fees apply evenhandedly to both in-state and out-of-state generators. However, this court must review the practical effect of the regulation on interstate commerce. The regulation only applies to generators who dispose of waste at an off-site treatment facility. Approximately 98–99% of the waste disposed of off-site is generated out-of-state[24]. Thus, the practical effect of the regulation is to raise the costs of disposing of waste in South Carolina for out-of-state entities, while leaving the costs of their in-state counterparts essentially unaffected. *Government Suppliers Consolidating Serv. v. Bayh*, 975 F.2d 1267, 1279 (7th Cir.1992). The regulation significantly reduces the flow of out-of-state waste.

Because this provision discriminates in practical effect against interstate commerce, it is subject to the higher level of scrutiny, and the burden shifts to the defendants to demonstrate that the regulation furthers concerns that cannot be adequately served by nondiscriminatory alternatives. The defendants claim that these fees are imposed to provide funding for DHEC's infectious waste program. This court finds that this is a legitimate state purpose, but that the purpose could be achieved by levying the fees on all generators who dispose of waste in South Carolina, whether the waste is disposed of at an off-site or on-site facility. The funding of the program cannot be based on a distinction between in-state and out-of-state waste. Since a less discriminatory method is available to provide funding, the court finds the regulation to be unconstitutional.

The next challenged provision is Reg. 61–105 CC(4)[25], which imposes a permit

---

Oregon Supreme Court, South Carolina's statute in its present state, would still be held unconstitutional.

**23.** CC(2) states:
(a) Generators who dispose of infectious waste at an off-site permitted treatment facility in this State must apply for authorization for treatment and pay a fee according to the estimated amount to be disposed for the year. If a generator exceeds the specific authorized amount, the generator must pay the appropriate fee in addition to the amount initially paid. No credits will be given for amounts authorized, but unused.
(b) Fees for generators are:

| Amount (in tons per year) | FEE (in $s) |
|---|---|
| in-state small quantity generators | No fee |
| Less than 0.3 | 25 |
| 0.3–99 | 100 |
| 100–249 | 250 |

| | |
|---|---|
| 250–499 | 500 |
| 500–999 | 1000 |
| 1000–1500 | 1500 |
| Greater than 1500 | 1500 + $5 per ton in excess of 1500 tons per year |

**24.** At this time there is only one off-site facility in this state.

**25.** Regulation CC(4) states: Fees for intermediate handling facilities and treatment facilities are due at the time of permit application. The fees are based on daily permitted capacity in tons. The fees are as follows:

| Type of Facility | Fee (in $s) |
|---|---|
| Permit by Rule | No Fee |
| Intermediate Handling Facility | 100/ton |
| Permitted Treatment Facility | 1000/ton |

fee for facilities which handle and treat infectious waste. The regulation exempts facilities which are defined as "permit by rule" facilities. Section W of the same regulation grants a "permit by rule" to facilities which prove that more than 75% (by weight, in a calendar year) of all infectious waste that is stored, treated or disposed of by that facility is generated on-site. The permit fee regulation draws a distinction between waste generated on-site and off-site. For the same reasons advanced by the court in discussing the generator fees, the regulation discriminates against interstate commerce because the real distinction drawn by the regulation is between in-state and out-of-state waste. Thus, this regulation is subject to the higher level of scrutiny, and the burden shifts to the defendants to demonstrate that the regulation furthers concerns that cannot be adequately served by nondiscriminatory alternatives. The defendants claim that these fees are imposed to provide funding for DHEC's infectious waste program. As noted earlier in the discussion of generator fees, this court finds that this is a legitimate state purpose, but that the purpose could be achieved by levying the permit fees on all facilities that dispose of waste in South Carolina, whether at an off-site or on-site facility. The funding of the program cannot be based on creating a distinction between in-state and out-of-state waste. Once again, since a less discriminatory method is available to provide funding, the court has determined that the regulation is unconstitutional.

■■■] The last challenged provision is Reg. 61–105 CC(3) [26]. Under § CC(3)(a), "[t]ransporters who transport infectious waste in this state must apply for registration and pay a fee according to the amount of waste transported during the year." This regulation appears to apply to any transportation of

waste regardless of whether the waste is disposed of in South Carolina.[27] The regulation imposes a fee on the interstate transport of waste and is not solely regulatory in nature. The plaintiffs contend that since this regulation imposes a direct fee on the actual interstate transport of waste, the proper commerce clause analysis to be applied is contained in *American Trucking Assoc., Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) which sets forth the "internal consistency test", discussed infra. The defendants contend that the proper analysis is the one this court has employed throughout this order, namely either strict scrutiny or *Pike* balancing. While this court feels that the proper analysis is the "internal consistency test", it will also analyze the statute under the analysis suggested by the defendants in an abundance of caution.

First, in *American Trucking Assoc., Inc. v. Scheiner*, 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987), the Supreme Court struck down Pennsylvania "axle taxes," stating that "in practical effect since they impose a cost per mile on appellant's trucks that is approximately five times as heavy as the cost per mile borne by local trucks, the taxes are plainly discriminatory." The Court stated:

> Whether the full brunt, or only a major portion, of their burden is imposed on the out-of-state carriers, their inevitable effect is to threaten the free movement of commerce by placing a financial barrier around the State of Pennsylvania. To pass the "internal consistency" test, a state tax must be of a kind that, if applied by every jurisdiction, there would be no impermissible interference with free trade. *Armco, Inc. v. Hardesty*, 467 U.S. [638], 644 [104 S.Ct. 2620, 2623, 81 L.Ed.2d 540] (1984). If each State imposed flat taxes for the privilege of making commercial entrances

---

**26.** Reg. 61–105 CC3(a) states: Transporters who transport infectious waste in this state must apply for registration and pay a fee according to the amount of waste transported during the year. If a transporter exceeds the specific authorized amount, the transporter must pay the appropriate fee in addition to the amount initially paid.

No credits will be given for amounts authorized, but unused.

Note: Section b sets outs the fee schedule.

**27.** The statute also appears to impose fees on waste being transported out-of-state because it includes any transport in South Carolina.

into its territory, there is no conceivable doubt that commerce among the States would be deterred. *Scheiner,* 483 U.S. at 284, 107 S.Ct. at 2840.[28]

Therefore, this court must apply the "internal consistency test" to the South Carolina statute. If every state were to impose a fee on the transportation of waste through that state on a per-tonnage basis, regardless of whether the waste is disposed of in the state, the cumulative effect on interstate commerce could be substantial. Transporters who travel through multiple states, with the same quantity of waste, would be subject to higher costs than intrastate transporters who are only subject to one state's fee. In footnote 16 of *American Trucking Assoc., Inc. v. Scheiner,* 483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987), the court stated: "True, each fee is imposed upon the use of different states' highways, but the cumulative effect does not result from the mileage or distance traveled, but from the interstate character of the journey. The same mileage in one state would result in only one tax." citing Lockhart, *State Tax Barriers to Interstate Trade,* 53 Harv.L.Rev. 1253, 1269 (1940). The inevitable effect of this regulation is to threaten the free movement of commerce by placing a financial barrier around the State of South Carolina. Thus, since this regulation fails the "internal consistency" test and raises a financial barrier around the state of South Carolina, this court finds it to be unconstitutional. *Government Suppliers* at 1281.

In the alternative, if a higher court holds that the *Scheiner* case does not provide the proper analysis, this court will analyze the statute under the analysis proposed by the defendants. Even though the fee does not discriminate between in-state and out-of-state waste on its face, this court finds that the effects on interstate commerce are significant. This fee places a great burden on the transportation of waste and even applies to a transporter of waste who is merely passing through the state. Since *Pike* is applied only when a statute regulates evenhandedly and has only indirect effects on interstate commerce, this court finds that strict scrutiny applies because of the significant direct effects on interstate commerce. Thus, the burden shifts to the state to prove that such discrimination is justified because the concerns addressed by the statute can not be served by nondiscriminatory alternatives.

The defendants argue that these fees are necessary to fund the State's infectious waste program. As stated in *Chemical Waste Management, Inc. v. Hunt,* —— U.S. ——, ——, 112 S.Ct. 2009, 2015, 119 L.Ed.2d 121 (1992), one less discriminatory means of providing funding for South Carolina's waste management program is a per-ton fee on *all* hazardous [or infectious] waste disposed of within South Carolina, *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). Thus, since at least one less discriminatory method is available to provide funding, the court finds the regulation to be unconstitutional.

For the reasons stated herein, each of the following provisions of the South Carolina Infectious Waste Management Act and of Regulation 61–105 of the South Carolina Department of Health and Environmental Control is hereby declared unconstitutional:

1. S.C.Code Ann. § 44–93–110

2. S.C.Code Ann. § 44–93–160

3. Reg. 61–105 Q(1)(h)

4. Reg. 61–105 K(5)(a), (c), (d), & (f)

5. Reg. 61–105 CC(2)

6. Reg. 61–105 CC(3)

7. Reg. 61–105 CC(4)

---

**28.** Even though South Carolina's statute refers to the imposition of fees instead of taxes, this court does not find the distinction critical here because state taxes are also subject to commerce clause analysis. "A state may not tax a transaction more heavily when it crosses state lines than when it occurs entirely within the state." *Chemical Waste,* —— U.S. at ——, 112 S.Ct. at 2013, citing *Armco Inc. v. Hardesty,* 467 U.S. 638, 642, 104 S.Ct. 2620, 2622, 81 L.Ed.2d 540 (1984).

The State is hereby enjoined from administering or enforcing any of the provisions listed above.[29]

IT IS SO ORDERED.

---

29. The plaintiffs also have equal protection and due process claims against all of the challenged provisions. This court has addressed the plaintiff's equal protection and due process arguments as to the cap since it was the only provision which was held not to have violated the commerce clause. This court finds it unnecessary to address plaintiff's equal protection and due process claims as to the remaining challenged provisions since those have been found unconstitutional under the commerce clause.