CHAMBERS MEDICAL TECHNOLO-
GIES OF SOUTH CAROLINA, INCOR-
PORATED, Plaintiff–Appellant,

and

Southland Exchange Joint
Venture, Plaintiff,

v.

Douglas E. BRYANT, as Commissioner of
the South Carolina Department of
Health and Environmental Control;
South Carolina Department of Health
and Environmental Control, Defen-
dants–Appellees.

CHAMBERS MEDICAL TECHNOLO-
GIES OF SOUTH CAROLINA, INCOR-
PORATED, Plaintiff–Appellee,

and

Southland Exchange Joint
Venture, Plaintiff,

v.

Douglas E. BRYANT, as Commissioner of
the South Carolina Department of
Health and Environmental Control;
South Carolina Department of Health
and Environmental Control, Defen-
dants–Appellants.

Nos. 94–1400, 94–1414.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 31, 1994.

Decided April 21, 1995.

**ARGUED:** Bradford W. Wyche, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, for appellant. Stephen A. Spitz, Smith, Bundy, Bybee & Barnett, P.C., Charleston, SC, for appellees. **ON BRIEF:** Gregory J. English, Wyche, Burgess, Freeman & Parham, P.A., Greenville, SC, for appellant. Ellison D. Smith, IV, Smith, Bundy, Bybee & Barnett, P.C., Charleston, SC; Thomas Travis Medlock, Cameron Littlejohn, Jr., Office of the Atty. Gen. of S.C., Columbia, SC; Samuel L. Finklea, III, Walton J. McLeod, III, South Carolina Dept. of Health & Environmental Control, Columbia, SC, for appellees.

Before WILKINS and MICHAEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed in part and remanded in part by published opinion. Judge WILKINS wrote the opinion, in which Judge MICHAEL and Senior Judge PHILLIPS joined.

## OPINION

WILKINS, Circuit Judge:

Chambers Medical Technologies of South Carolina, Incorporated (Chambers) appeals a decision of the district court upholding the constitutionality—under the Commerce and Equal Protection Clauses of the United States Constitution—of a fluctuating treatment cap on the amount of infectious waste that a "permitted commercial infectious waste incinerator facility" may incinerate, which is imposed by § 44–93–210 of the South Carolina Infectious Waste Management Act, S.C.Code Ann. §§ 44–93–10 to –240 (Law. Co-op. Supp.1993) (the Act), and S.C.Code Regs. 61–105(V)(2) (Supp.1993). *See Chambers Medical Techs. of S.C., Inc. v. Jarrett,* 841 F.Supp. 1402 (D.S.C.1994). The South Carolina Department of Health and Environmental Control[1] cross appeals the decision of the district court that a regulation DHEC promulgated pursuant to the Act, which requires refrigeration of infectious medical waste that will travel more than 24 hours after leaving the site at which it is generated before reaching the ultimate disposal site, is violative of the Commerce Clause. DHEC further challenges Chambers' standing to assert the unconstitutionality of two other provisions of the Act that the district court held unconstitutional. For the reasons set forth below, we remand for further proceedings on the question of whether the fluctuating treatment cap passes constitutional muster under the Commerce Clause. We affirm the judgment of the district court in all other respects.

## I.

Prior to May 1991, Southland Exchange Joint Venture owned a facility in Hampton, South Carolina that incinerated medical, municipal solid, and commercial nonhazardous waste. The Hampton facility is the only commercial facility in South Carolina that incinerates infectious waste.[2]

Southland brought this action in June 1990, challenging two amendments to the South Carolina Infectious Waste Management Act that were due to take effect the following month.[3] The district court granted a preliminary injunction prohibiting enforcement of the two amendments. In May 1991, Southland sold the Hampton facility to Chambers, and Chambers subsequently was substituted as plaintiff. Thereafter, Chambers filed an amended complaint in which it claimed that the following provisions of the Act and DHEC's implementing regulations were unconstitutional under the Commerce, Equal Protection, and Due Process Clauses:[4]

(1) the "blacklisting" provision, S.C.Code Ann. § 44–93–110;

(2) the "demonstration of need" provisions, S.C.Code Ann. § 44–93–125 and S.C.Code Regs. 61–105(V)(1), (3);

(3) the fluctuating treatment cap, S.C.Code Ann. § 44–93–210 and S.C.Code Regs. 61–105(V)(2);

(4) the "backhauling" regulation, S.C.Code Regs. 61–105(Q)(1)(h);

---

1. Appellees are the South Carolina Department of Health and Environmental Control and its Commissioner, Douglas E. Bryant. We refer to Appellees collectively as "DHEC."

2. Infectious waste is defined by S.C.Code Ann. § 44–93–20 to mean "sharps," *e.g.*, needles; "cultures and stocks of infectious agents and associated biologicals"; "human blood and blood products"; "pathological waste"; "contaminated animal carcasses, body parts, and bedding of animals intentionally exposed to pathogens"; and "isolation waste pursuant to the 'Guidelines for Isolation Precautions in Hospitals', Centers for Disease Control." *See also* S.C.Code Regs. 61–105(E).

3. These two amendments were: (1) an increase in the fees imposed on commercial waste facilities treating infectious waste from $18 per ton to

$30 per ton for infectious waste generated out-of-state and from $13 per ton to $25 per ton for infectious waste generated in-state, *see* S.C.Code Ann. § 44–93–160 note; and (2) the imposition of a cap on the amount of infectious waste a permitted infectious waste incinerator facility could incinerate in any month, *see* S.C.Code Ann. § 44–93–210.

4. Chambers also brought challenges based on South Carolina law. The district court declined to exercise jurisdiction over these claims, because they raised complex issues of state law, and dismissed them pursuant to 28 U.S.C.A. § 1367(c)(1) (West 1993). *Chambers Medical Techs. of S.C., Inc.,* 841 F.Supp. at 1406 n. 1. Chambers does not challenge this ruling.

(5) the refrigeration regulation, S.C.Code Regs. 61–105(K)(5);

(6) the treatment fees provision, S.C.Code Ann. § 44–93–160;

(7) the generator fees regulation, S.C.Code Regs. 61–105(CC)(2);

(8) the transporter fees regulation, S.C.Code Regs. 61–105(CC)(3); and

(9) the permit fee regulation, S.C.Code Regs. 61–105(CC)(4).

Following a bench trial, the district court ruled that Chambers lacked standing to challenge the constitutionality of the demonstration of need provisions contained in S.C.Code Ann. § 44–93–125 and S.C.Code Regs. 61–105(V)(1), (3) and accordingly dismissed this claim. *Chambers Medical Techs. of S.C., Inc.*, 841 F.Supp. at 1408–09. Turning to the merits, the district court held that, with the exception of the fluctuating treatment cap, all of the remaining provisions were unconstitutional under the Commerce Clause.[5] *Id.* at 1409–20. The district court concluded that the fluctuating treatment cap passed constitutional muster under the Commerce, Equal Protection, and Due Process Clauses. *Id.* at 1411–13 & n. 17.

Both Chambers and DHEC appeal. Chambers maintains that the district court erred in holding that the fluctuating treatment cap was constitutional under the Commerce Clause and the Equal Protection Clause. DHEC asserts that the district court erred in concluding: (1) that Chambers had standing to raise the constitutionality of the generator fees and blacklisting provisions; and (2) that the refrigeration requirement of S.C.Code Regs. 61–105(K)(5)(d) violates the Commerce Clause. We consider these arguments seriatim.

## II.

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. While the Commerce Clause does not explicitly govern state action, it is well established that the "dormant" or "negative" Commerce Clause prohibits states from enacting legislation that "unjustifiably . . . discriminate[s] against or burden[s] the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, —— U.S. ——, ——, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994).

■ The constitutionality under the negative Commerce Clause of state regulation affecting interstate commerce is analyzed by one of two tests depending on the type of regulation at issue. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 2083–84, 90 L.Ed.2d 552 (1986). First, if a state statute discriminates against interstate commerce on its face, in its practical effect, or in its purpose, "a 'virtually *per se* rule of invalidity'" applies. *Wyoming v. Oklahoma*, 502 U.S. 437, 454–55, 112 S.Ct. 789, 800, 117 L.Ed.2d 1 (1992) (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978)); *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342–43, 112 S.Ct. 2009, 2014, 119 L.Ed.2d 121 (1992); *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270, 104 S.Ct. 3049, 3054–55, 82 L.Ed.2d 200 (1984). A statute discriminates against interstate commerce when it provides for "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys.*, —— U.S. at ——, 114 S.Ct. at 1350. In order to pass constitutional muster under this heightened scrutiny, the state must demonstrate that "the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism," *Wyoming v. Oklahoma*, 502 U.S. at 454, 112 S.Ct. at 800, and that there are no "'nondiscriminatory alternatives adequate to preserve the local interests at stake,'" *Chemical Waste Management, Inc.*, 504 U.S. at 342, 112 S.Ct. at 2014 (quoting *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977)). *See also Maine v. Taylor*, 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). Second, if a state law "regulates

---

**5.** Having found the statutory provisions and regulations violative of the Commerce Clause, the court did not address their constitutionality under the Equal Protection or Due Process Clauses.

evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970). However, "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown–Forman Distillers Corp.*, 476 U.S. at 579, 106 S.Ct. at 2084. Thus, the first step in determining whether § 44–93–210 [6] violates the Commerce Clause is deciding which type of state regulation is at issue. *Oregon Waste Sys.*, —— U.S. at ——, 114 S.Ct. at 1350.

### A.

Section 44–93–210 places a fluctuating limit, or cap, on the quantity of infectious waste that a South Carolina "permitted commercial infectious waste incinerator facility" may burn.[7] The level of the cap is determined annually by DHEC based on the estimated amount of infectious waste to be generated in South Carolina during the ensuing year, but may not be less than a specified floor. S.C.Code Ann. § 44–93–210(A); S.C.Code Regs. 61–105(V)(2).[8] Permitted commercial infectious waste incineration facilities may burn only one-twelfth of the estimated amount of such waste in any one month. S.C.Code Ann. § 44–93–210(A); S.C.Code Regs. 61–105(V)(2). The cap does not apply

to infectious waste incinerated by hospitals or other entities producing infectious waste, provided that the infectious waste is generated in-state and is incinerated on a nonprofit basis. S.C.Code Ann. § 44–93–210(B).

### 1.

We first consider whether § 44–93–210 is discriminatory on its face or in its practical effect. The district court held that the fluctuating treatment cap was not discriminatory on either of these two bases. *Chambers Medical Techs. of S.C., Inc.*, 841 F.Supp. at 1412. The district court concluded that the fluctuating treatment cap does not discriminate against interstate commerce on its face because the cap applies to the amount of infectious waste that a commercial incinerator facility may burn, irrespective of the origin of that waste. *Id.* And, although the fluctuating treatment cap is determined based on the expected level of infectious waste to be generated in South Carolina, the court determined that the cap was not discriminatory in its effect because it applied evenhandedly to waste generated in-state and out-of-state since no restrictions are imposed based on the origin of the waste. *Id.* at 1412–13. Thus, the district court ruled that the *Pike* balancing test was the proper one for analyzing the constitutionality of the cap. *Id.* at 1413.

Chambers argues that the district court applied the incorrect test, maintaining that the heightened Commerce Clause analysis applicable to state regulation that discrimi-

---

**6.** Due to the similarity of the language in § 44–93–210 and regulation 61–105(V)(2), our discussion addresses only the former.

**7.** Section 44–93–210 provides:

(A) Beginning November 1, 1990, and annually thereafter, [DHEC] shall estimate and publish the amount of infectious waste it expects to be generated within this State during the succeeding calendar year. No permitted commercial infectious waste incinerator facility may burn more than one-twelfth of the annual estimate of infectious waste during any one month of the year to which the estimate applies. However, at no time may the limit on the amount of infectious waste burned in a month be less than fifteen hundred tons.

(B) The limitation on the tonnage of infectious waste does not apply to infectious waste

treated by hospitals or generator facilities if the waste is generated in this State and is incinerated on a nonprofit basis.

(C) For purposes of this section, a permitted commercial infectious waste incinerator facility means a site where infectious waste is incinerated regardless of the number of incinerator units or the ownership of the units.

**8.** S.C.Code Regs. 61–105(V)(2) states:

[DHEC] will determine and publish annually an estimate of the amount of infectious waste to be generated in South Carolina during the ensuing twelve months. During any one calendar month no permitted waste treatment facility shall treat or dispose of more than the lesser of 1500 tons or one-twelfth of the published estimated amount.

nates against interstate commerce should have been applied to the cap because the provision does not regulate evenhandedly. It first asserts that the fluctuating treatment cap is facially discriminatory against out-of-state waste because the amount of waste that can be processed is tied to the level of waste expected to be generated in South Carolina. In other words, Chambers contends that because the cap is inextricably tied to the amount of medical waste generated in South Carolina, it does not regulate evenhandedly. According to Chambers, in-state generators are unaffected by the law because the cap will increase in direct proportion to the amount of waste they produce; thus, for in-state generators there is no cap. Out-of-state generators, on the other hand, are limited in their ability to have waste treated in South Carolina facilities by the amount of waste generated in-state. Chambers also argues that the practical effect of the cap is discriminatory because DHEC has authorized it to treat 3,000 tons of waste per month, and even if it treated all of the infectious waste generated in South Carolina (slightly more than 1,500 tons per month), it would still have more than 1,400 tons of capacity—a waste stream that necessarily would be consumed by out-of-state waste. This, Chambers asserts, demonstrates a severe interruption in the flow of interstate commerce. These arguments lack merit.

The Supreme Court has held that state regulations prohibiting the disposal of or imposing increased burdens on waste merely because it is generated out-of-state violate the Commerce Clause, but the Court has indicated that an evenhanded, nondiscriminatory limitation on the amount of waste disposed of that does not discriminate on the basis of the waste's origin would pass constitutional muster. *See Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources*, 504 U.S. 353, 365–67, 112 S.Ct. 2019, 2027, 119 L.Ed.2d 139 (1992); *Chemical Waste Management, Inc.*, 504 U.S. at 344–45, 112 S.Ct. at 2015; *Philadelphia v. New Jersey*, 437 U.S. at 626–27, 98 S.Ct. at 2536–37. The method by which the level of the fluctuating treatment cap imposed by South Carolina is established does not place increased burdens on waste based on its origin. The fact that the level of the cap is tied to the amount of in-state production of waste does not burden out-of-state producers any more than in-state producers, nor does it place a burden on out-of-state waste any greater than a flat cap. Nothing would prohibit Chambers, or any other permitted commercial waste incineration facility in the State, from choosing to incinerate infectious waste generated out-of-state to the exclusion of waste generated in-state. Thus, because the method by which the level of the cap is established uniformly burdens infectious waste generated both in-state and out-of-state, we conclude that the treatment cap does not discriminate against interstate commerce on its face or in its practical effect for this reason.[9]

**9.** Chambers claims that the decision of this court in *Hazardous Waste Treatment Council v. South Carolina*, 945 F.2d 781 (4th Cir.1991) (*HWTC*), requires that we hold that the use of the amount of waste generated in South Carolina to establish the level of the fluctuating treatment cap renders the cap violative of the Commerce Clause. The statutory cap at issue in *HWTC* involved a cap of 110,000 tons per year on the amount of hazardous waste that could be disposed of at landfill sites, but the cap could increase depending on the amount of hazardous waste generated in-state that was disposed of at landfill sites. Chambers contends that with respect to this cap, this court wrote:

South Carolina may preserve the capacity [in landfills] by limiting total disposal and treatment within the state *without reference to whether in-state or out-of-state waste is actually involved.* But in a national economy filled with benefits and burdens, South Carolina may

not be permitted to stop the flow of hazardous waste at its time of treatment and disposal at the borders.

*Id.* at 792 (footnote omitted) (emphasis added). We do not view the language on which Chambers relies as dispositive of whether the reference to the amount of waste generated in South Carolina renders the fluctuating treatment cap on infectious waste violative of the Commerce Clause. First, *HWTC* came to the court on appeal from a grant of preliminary injunction by the district court against the State, enjoining it from implementing a number of provisions in the South Carolina Hazardous Waste Management Act. The order of the district court was imprecise concerning what provisions of the Act were to be enjoined. *Id.* at 787. This court attempted to clarify the provisions covered by the injunction by noting, "Specifically, the preliminary injunction properly extends to provisions relating to preference for in-state waste, prohibitions, limits,

**2.**

State legislation may be found to be discriminatory on the basis of its purpose, and Chambers maintains that the fluctuating treatment cap is discriminatory for this reason also. *See Bacchus Imports, Ltd.,* 468 U.S. at 270, 104 S.Ct. at 3054–55; *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 471 n. 15, 101 S.Ct. 715, 727 n. 15, 66 L.Ed.2d 659 (1981); *see also Washington Apple Advertising* Comm'n, 432 U.S. at 352–53, 97 S.Ct. at 2446–47.[10]   Chambers points to statements made by South Carolina legislators during committee hearings that indicate that the purpose of the fluctuating treatment cap was to discourage out-of-state generators from shipping infectious medical waste to South Carolina for treatment, while ensuring that enough treatment capacity existed to satisfy the needs of South Carolina generators.

The South Carolina legislature did not include a statement of the purpose for the fluctuating treatment cap in the legislation enacting it to which this court may defer in determining the purpose of the cap, nor are there committee reports reflecting the purpose of the cap. *See Clover Leaf Creamery Co.,* 449 U.S. at 463 n. 7, 471 n. 15, 101 S.Ct. at 723 n. 7, 727 n. 15 (despite finding by district court that the legislature's motive was discriminatory, Supreme Court deferred to statement of purpose included by the legislature in the act). Further, the South Carolina courts have not had occasion to express an opinion on the purpose of the legislature in enacting the cap. *See Bacchus Imports, Ltd.,* 468 U.S. at 270–71, 104 S.Ct. at 3054–55.

In the section of its opinion entitled "FINDINGS OF FACT/BACKGROUND," the district court wrote, "South Carolina, like

or other restrictions on the acceptance of certain out-of-state waste, and permitting restrictions referring to out-of-state waste or limiting need to in-state waste." *Id.* The court went on to note which provisions of the Act appeared to be included. *Id.* n. 9. Among the provisions we referenced was " § 44–56–60(a)(3)(B), with the exception of the final paragraph, 'Certification … site.' " *Id.* This is the code section that provides for the cap, but it also embraces other provisions—for example, a requirement that a person operating a hazardous waste disposal facility reserve at least the same capacity to dispose of hazardous waste generated in South Carolina that was disposed of at the facility during the previous year. Because the cap on the disposal of hazardous waste does not fit within the types of provisions this court specifically referenced as included within the injunction, we cannot conclude that it was one of the provisions covered by the injunction. Moreover, a review of the district court decision reveals that the plaintiff had challenged the preference provisions of the cap, not the method by which the cap was established. *Hazardous Waste Treatment Council v. South Carolina,* 766 F.Supp. 431, 437–38 (D.S.C. 1991). Further, the language quoted above on which Chambers relies is contained in the portion of the opinion after we addressed the reciprocity provision of the South Carolina Act in which we considered all "remaining legislation." *HWTC,* 945 F.2d at 792. From the surrounding discussion, it is apparent that the language to which Chambers points was primarily referring to the provisions of the Act that gave a preference to in-state waste disposal. *Id.* ("South Carolina seems unlikely to meet the burden of showing that burying in-state hazardous waste rather than out-of-state waste advances the health and

safety of South Carolina citizens."). For these reasons, we conclude that we were not addressing the method by which the cap was established in our later discussion of the likelihood of success on the merits.

**10.** The State argues that it is improper to examine legislative motivation because (1) under South Carolina law, when a statute is clear there is no need to examine legislative intent; (2) legislative comments by a few individuals should not be attributed to the legislature as a whole; and (3) the legislative history relied upon by Chambers relates to a bill that was not actually passed by the legislature. With respect to the first point, the Supreme Court has expressly stated that the legislature's motivation is a necessary consideration in resolving the federal question of whether state regulation violates the Commerce Clause; thus, South Carolina law concerning statutory construction is not controlling. With respect to the second point, although the comments of certain legislators may not be dispositive of the question of motivation, such comments are no doubt relevant to such a determination. With respect to the third point, it is undisputed that the comments that form the basis of Chambers' argument are addressed to the cap at issue; that the bill discussed in the hearing transcript was reported favorably out of committee and passed by the South Carolina House of Representatives; and that although this bill was not enacted by the South Carolina Senate, the same language was attached to another bill which became law. Under these circumstances, although the cap was enacted as a part of a different bill, we believe that the statements are relevant to the issue of whether the legislation was enacted for a discriminatory purpose.

other states, has attempted to deal with th[e] influx of out-of-state waste with legislation which discourages out-of-state waste." *Chambers Medical Techs. of S.C., Inc.*, 841 F.Supp. at 1405–07. We are uncertain whether this statement should be viewed as a finding by the district court that the South Carolina legislature acted with discriminatory intent in enacting the South Carolina Infectious Waste Management Act. First, while the statement does lend itself to this reading, the statement could also reasonably be interpreted as an observation that the legislation enacted has had the effect of discouraging out-of-state waste. In addition, a finding that the fluctuating treatment cap was enacted for a discriminatory purpose would render heightened Commerce Clause scrutiny appropriate, yet the district court did not apply heightened scrutiny. On the other hand, the district court did not render a factual finding

specifically rejecting Chambers' assertion that the fluctuating treatment cap was enacted for a discriminatory purpose. We are ill-suited to resolve this question in the first instance due to the inherently factual nature of the inquiry. Thus, if the level of scrutiny to which the fluctuating treatment cap is subject is dispositive of its constitutionality, a remand for further proceedings is required.[11]

### B.

For the reasons set forth above, we are uncertain which level of Commerce Clause scrutiny properly applies. However, DHEC argues that even if the heightened Commerce Clause scrutiny is applicable, the fluctuating treatment cap passes constitutional muster. Conversely, Chambers contends that the cap is violative of the Commerce Clause even if the *Pike* balancing test is

11. During our consideration of whether § 44–93–210 discriminates against interstate commerce on its face or in its practical effect, we became concerned that the statute was discriminatory for a reason not argued by Chambers before this court or presented by Chambers to the district court. Section 44–93–210(A) provides that the fluctuating treatment cap applies to all "permitted commercial infectious waste incinerator facilit[ies]." Section 44–93–210(C) defines permitted commercial infectious waste incinerator facilities as "a site where infectious waste is incinerated regardless of the number of incinerator units or the ownership of the units." Thus, on its face, the cap applies to all sites where infectious waste is incinerated. However, § 44–93–210(B) exempts from the fluctuating treatment cap "hospitals or generator facilities if the waste is generated in this State and is incinerated on a nonprofit basis." The district court found, and the parties do not dispute on appeal, that Chambers' Hampton facility is the only infectious waste incinerator facility in South Carolina burning infectious waste on a commercial basis, although more than 40 hospitals in the state incinerate their own infectious waste. Thus, it appears that the treatment cap is applicable only to Chambers' Hampton facility and further that Chambers' Hampton facility is the only such facility treating out-of-state waste. If this is the case, § 44–93–210 would appear to be discriminatory in its practical effect, and application of heightened Commerce Clause scrutiny would be appropriate.

The question of the constitutionality under the Commerce Clause of the fluctuating treatment cap was squarely presented to this court, including the question of whether § 44–93–210 was discriminatory on its face or in its practical effect. We believe that to hold the statute does not

discriminate on its face or in its practical effect when the record before us demonstrates that there is a significant possibility that it, in fact, is discriminatory simply because Chambers did not assert a particular basis for its contention would, under the unique circumstances presented, amount to a fundamental miscarriage of justice. *See Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir.1985) (considering issue raised sua sponte by this court where failure to do so would amount to a fundamental miscarriage of justice).

Being mindful of the desirability of rendering a final decision on this important issue without the necessity of a remand, both in terms of resolving the legal uncertainty surrounding this issue and in terms of conserving the resources of the courts and the parties, we have seriously considered proceeding to rule on the constitutionality of § 44–93–210. However, DHEC strenuously objects, and understandably so, to our deciding the constitutionality of § 44–93–210 on this basis without its first having been afforded an opportunity to present a valid reason unrelated to economic protectionism for the discrimination and the absence of nondiscriminatory alternatives. Thus, we believe that the most appropriate course is to remand the question to the district court for further proceedings. Upon remand, if the district court finds no discriminatory purpose in enacting the fluctuating cap provisions, it should then consider, on the present or a reopened record, whether the fluctuating cap provisions of the Act are made discriminatory, either facially or in practical effect, by the exemption provision, § 44–93–210(B). Depending upon the outcome of this inquiry, the district court may also deem advisable consideration of the severability provision contained in S.C.Code Ann. § 44–93–230.

applied. Because a remand for further proceedings would not be necessary if either of these positions were accepted, we turn to address them.

■ Under the more stringent Commerce Clause test applied to state regulation that discriminates on its face, in its practical effect, or in its underlying purpose, a discriminatory state regulation will be held unconstitutional unless the state demonstrates that the discrimination is justified by a valid factor unrelated to economic protectionism and that there are no nondiscriminatory alternatives adequate to preserve that interest. *Wyoming v. Oklahoma*, 502 U.S. at 453–57, 112 S.Ct. at 800–01. DHEC advanced the following concerns as those the State sought to address through the fluctuating treatment cap: disruption of the traffic flow in the area of the Hampton facility,[12] leaking trailers,[13] and the deposit of noncombusted material in the landfill.[14] These goals are valid factors unrelated to economic protectionism; however, there are nondiscriminatory alternatives that would equally—or better—further them. For example, the State could correct these problems by requiring additional parking facilities, regulating the types of containers in which waste is transported, and imposing more stringent incineration requirements. Because nondiscriminatory alternatives exist that could adequately address the State's concerns, the fluctuating treatment cap could not be held constitutional applying the more stringent analysis.

■ Under the less stringent *Pike* balancing test, applied when state legislation regulates evenhandedly and has only incidental effects on interstate commerce, a state statute is constitutional under the Commerce Clause "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142, 90 S.Ct. at 847. The constitutionality of the regulation depends upon "the nature of the local interest involved" and whether that interest could be fostered as effectively by state regulation that impacts upon interstate commerce to a lesser degree. *Id.* Chambers argues that the concerns identified by the State are frivolous—in essence because the problems identified by the State have been solved under its operation without application of the cap. Further, Chambers asserts that DHEC has granted it a permit to incinerate 3,000 tons of waste per month and that the fluctuating treatment cap will reduce by nearly one-half the amount of waste that DHEC has determined can safely be incinerated at the Hampton facility, causing a severe disruption of interstate commerce.

Applying the *Pike* balancing test here, we cannot conclude that the burden on interstate commerce is clearly excessive in relation to the putative local benefit. The purposes advanced by the State involve matters of public and highway safety—areas that have traditionally been recognized as appropriate fields of state regulation. *See, e.g., Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 443, 98 S.Ct. 787, 795, 54 L.Ed.2d 664 (1978). We cannot agree with Chambers' characterization of the problems at the Hampton facility as frivolous; that Chambers was able to resolve these problems in the main does not lessen the State's interest in addressing them. And, there has been no suggestion that a reduction in the amount of infectious waste that commercial facilities may burn would not tend to reduce the problems iden-

12. Prior to the time Chambers began operating the Hampton facility there were instances in which as many as 100 tractor-trailer trucks containing infectious waste were parked beside the highway leading to the facility, causing traffic problems in the area. The district court found that since Chambers began operations, these problems have been cured.

13. Again, before Chambers purchased the facility, Southland experienced problems with receiving containers that were leaking bloody fluid, etc. The district court found that since Chambers has taken over operations, this problem has been reduced such that only 1 in 1,000 containers leaks and procedures have been implemented to disinfect areas affected by these leaks.

14. Prior to Chambers' purchase of the Hampton facility, unincinerated material was found in the landfill that accepts the ashes from the facility. On several occasions unincinerated human and animal body parts were found at the landfill or were removed from the landfill by animals and discovered elsewhere. It appears to be undisputed that since Chambers began operating the facility, this problem has also abated.

tified by the State. Further, in the absence of a finding that the fluctuating treatment cap discriminates against interstate commerce, we cannot conclude that the burden it imposes on interstate commerce is clearly excessive in relation to the local benefits intended. The only burden on interstate commerce to which Chambers can point is that its own capacity to incinerate such waste would be reduced by the cap. However, the cap would not prohibit the construction of other commercial incinerator facilities in the State that could incinerate out-of-state waste.[15] Thus, we cannot find that the burden on interstate commerce substantially outweighs the putative local benefit. *Cf. Pike*, 397 U.S. at 142–46, 90 S.Ct. at 847–49 (regulation requiring that cantaloupes grown in-state be packaged for sale in a specified manner prior to leaving the state, designed to protect and enhance the reputation of in-state growers, held unconstitutional because state had only a tenuous interest in requiring high quality cantaloupes to exhibit state name, and burden on interstate commerce was great); *see also Raymond Motor Transp., Inc.*, 434 U.S. at 444–47, 98 S.Ct. at 795–97 (state regulation with intended purpose of promoting highway safety held unconstitutional because undisputed evidence demonstrated that the regulation did not contribute to highway safety and imposed substantial burden on interstate movement of goods); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529–30, 79 S.Ct. 962, 967–68, 3 L.Ed.2d 1003 (1959) (state requirement that trucks traveling on state highways use specified mudflaps held unconstitutional because mudflaps did not in fact contribute to safety and may even have created additional safety hazards, and burden on interstate commerce was substantial because interstate carriers would have been subjected to varying requirements in different states).

In sum, employing heightened Commerce Clause analysis leads to the conclusion that the fluctuating treatment cap is unconstitu-

tional, while application of the less stringent *Pike* balancing inquiry leads to the conclusion that the statute must be upheld. Consequently, the question of which test to apply is dispositive. Because we are unable to determine from the record whether the district court resolved the question of discriminatory purpose against DHEC or whether it simply failed to address the question, and because the lower court and the parties have not had an opportunity to address whether § 44–93–210 discriminates on its face or in practical effect because the cap applies only to treatment facilities that incinerate out-of-state waste, we remand the issue to the lower court for additional proceedings on the question of whether § 44–93–210 violates the Commerce Clause.

### III.

■ Chambers also contends that the fluctuating treatment cap violates the Equal Protection Clause. The Equal Protection Clause guarantees that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Because the South Carolina fluctuating treatment cap does not classify on the basis of a suspect class or burden a fundamental right, it "is 'presumed to be valid and will be sustained if the classification ... is rationally related to a legitimate state interest.'" *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 81, 108 S.Ct. 1645, 1652, 100 L.Ed.2d 62 (1988) (alteration in original) (quoting *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985)); *Heller v. Doe*, —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). Thus, in assessing whether the fluctuating treatment cap violates the Equal Protection Clause, we must determine whether the goals the State sought to advance were legitimate and "whether it was 'reasonable for the lawmakers to believe that use of the challenged

---

**15.** We recognize that S.C.Code Ann. § 44–93–125 requires that in order to construct a new treatment facility a permit must be obtained from DHEC. Such permits are issued by DHEC based on the demonstration of a need for the facility. *Id.* Although § 44–93–125 provides that in demonstrating need for the facility, "infectious waste generated out-of-state may not be considered without [DHEC] approval," we cannot assume that DHEC would deny a permit on a basis that would violate the Commerce Clause. Thus, § 44–93–125 does not change our conclusion that the burden on interstate commerce is not clearly excessive.

classification would promote that purpose.'" *Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel,* 20 F.3d 1311, 1320 (4th Cir.1994) (quoting *Western & S. Life Ins. Co. v. State Bd. of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981)).

The district court concluded that the concerns relied upon by DHEC—traffic control, leaking containers, and noncombusted material in the landfill—were legitimate and that the cap was rationally related to these goals. Chambers does not dispute that these are legitimate matters of state concern, nor in our view could it meritoriously press such an argument. *See, e.g., Cleburne,* 473 U.S. at 440, 446–47, 105 S.Ct. at 3254, 3257–58 (noting that states are given broad discretion in areas of social or economic legislation, though some state objectives—for example, an intent to injure a politically unpopular group—would not be a legitimate state interest). Rather, Chambers contends that the cap is not rationally related to these goals.

■ In order to demonstrate that the treatment cap is not rationally related to the goals to be furthered by the legislature, Chambers must convince us that, when the treatment cap was enacted, the legislature could not rationally have conceived that it would benefit the citizens of South Carolina. *Smith Setzer & Sons, Inc.,* 20 F.3d at 1323–24. It is not within our province to sit as a superlegislative body to determine whether the judgments made by the legislature were wise or desirable. *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (per curiam). Instead, the sole question before us

> is whether there is no reasonable conception that could justify the state's action and whether the legislative actors were cognizant of this at the time they acted. In the absence of evidence of such arbitrary and irrational behavior on the part of the legis-

lature, the statute must survive rationality review.

*Smith Setzer & Sons, Inc.,* 20 F.3d at 1324.

Although we view the question as a close one, we cannot conclude that the legislature could not have reasonably believed that the fluctuating treatment cap would tend to alleviate the problems that were identified by the State. It is conceivable that the legislature recognized that the method of calculating the cap would result in a reduction of the amount of infectious waste burned at the Hampton facility and believed that if the facility were only allowed to incinerate a smaller amount of infectious waste than it had been incinerating, less waste would be transported to the facility, thereby reducing the traffic problems and the number of leaking containers, and less noncombusted material would be sent to the landfill. Accordingly, we conclude that the cap is rationally related to legitimate state interests and affirm the decision of the district court that the cap does not violate the Equal Protection Clause.

## IV.

■ DHEC cross appeals the determination of the district court that the refrigeration requirement contained in S.C.Code Regs. 61–105(K)(5)(d) [16] is unconstitutional under the Commerce Clause. Regulation 61–105(K)(5)(d) provides that once infectious waste leaves the site where it was generated, it must be refrigerated if it will travel more than 24 hours before reaching the disposal site. The district court concluded that although this statute appears to be evenhanded on its face, it nevertheless discriminates against interstate commerce in its effect because it imposes a higher cost on out-of-state waste transportation. *Chambers Medical Techs. of S.C., Inc.,* 841 F.Supp. at 1415–16. This is so, the district court reasoned, because only out-of-state generators are burdened by the requirement inasmuch as in-

---

**16.** Regulation 61–105(K)(5) provides in pertinent part:

Infectious waste must be maintained in a nonputrescent state using refrigeration when necessary.

. . . .

(d) Once infectious waste leaves the generator site, the waste shall not exceed twenty-four (24) hours at ambient temperature or 96 hours below 42 degrees Fahrenheit before delivery to a permitted treatment facility.

state generators are able to transport waste to an in-state facility within 24 hours.[17] *Id.* at 1416. Thus, only out-of-state generators will bear the increased costs of transporting waste in refrigerated trucks. *Id.*

DHEC argues that the provision does not burden out-of-state commerce because there are some locations where infectious waste is generated out-of-state from which it can be transported to the Hampton facility within the 24–hour time period. For example, DHEC would have us take judicial notice that driving time to the Hampton facility from Richmond, Virginia is ten hours and that driving time from Atlanta, Georgia is seven hours. However, the fact that not all interstate commerce is burdened by the refrigeration requirement does not alter the undisputed fact that only interstate commerce is burdened by the provision. *Cf. Washington Apple Advertising Comm'n,* 432 U.S. at 348–54, 97 S.Ct. at 2443–47 (holding that a state requirement that apples display only U.S.D.A. grade or no grade was violative of Commerce Clause as a state requirement discriminating against interstate commerce in practical effect because it burdened Washington apple producers, which labeled with a superior grading system, but did not burden North Carolina growers, which did not use a separate grading or labeling system); *Great Atl. & Pac. Tea Co. v. Cottrell,* 424 U.S. 366, 96 S.Ct. 923, 47 L.Ed.2d 55 (1976) (holding reciprocity requirement in state statute violated the Commerce Clause despite the fact that only producers from

states that had not entered reciprocity agreements would be burdened by the requirement).

Consequently, we conclude that the refrigeration requirement discriminates against interstate commerce in its effect. As such, the more stringent Commerce Clause analysis must be applied to determine the constitutionality of the provision. *See Washington Apple Advertising Comm'n,* 432 U.S. at 352–53, 97 S.Ct. at 2446–47. The district court applied this test and concluded that although the refrigeration requirement is directed to a legitimate concern of the State—control of odors associated with decaying waste—nondiscriminatory alternatives existed that could remedy this concern without burdening interstate commerce. *Chambers Medical Techs. of S.C., Inc.,* 841 F.Supp. at 1416. DHEC does not claim that the refrigeration provision can be held constitutional under this more stringent Commerce Clause analysis, and we cannot conclude that the finding of the district court—that alternative nondiscriminatory methods exist that would adequately serve the interest of the State—is clearly erroneous. *See Maine v. Taylor,* 477 U.S. at 145–46, 151, 106 S.Ct. at 2450–51, 2454. We therefore affirm the decision of the district court that the refrigeration provision of S.C.Code Regs. 61–105(K)(5)(d) violates the Commerce Clause.

V.

The district court held that S.C.Code Regs. 61–105(CC)(2),[18] which imposes a fee on gen-

---

17. DHEC did not argue in its brief that waste generated in-state that was transported more than 24 hours would have to comply with the refrigeration requirement—for example, when an in-state generator made arrangements to transport its waste via a circuitous in-state route that would take more than 24 hours to complete. When questioned about this point at oral argument, DHEC opined that the regulation would apply to in-state waste under such circumstances. However, there is no evidence in the record that any in-state generators of infectious waste operate in this manner as a practical matter. Thus, even if the refrigeration provision would apply to in-state generators under limited circumstances, we are nevertheless compelled to agree with the district court that the statute discriminates against interstate commerce in practical effect.

18. Regulation 61–105(CC)(2) provides:
    (a) Generators who dispose of infectious waste at an off-site permitted treatment facility

in this State must apply for authorization for treatment and pay a fee according to the estimated amount to be disposed for the year. If a generator exceeds the specific authorized amount, the generator must pay the appropriate fee in addition to the amount initially paid. No credits will be given for amounts authorized, but unused.
    (b) Fees for generators are:

| Amount (in tons per year) in-state small quantity generators | FEE (in $s) |
| --- | --- |
| [Less than] 0.3 | No Fee |
| 0.3-99 | 25 |
| 100-249 | 100 |
| 250-499 | 250 |
| 500-999 | 500 |
| 1000-1500 | 1000 |
| [Greater than] 1500 | 1500 |
| | 1500 + $5 per ton in excess of 1500 tons per year. |

erators who dispose of infectious waste at an off-site permitted treatment facility, and the blacklisting provision, S.C.Code Ann. § 44-93-110,[19] were unconstitutional under the Commerce Clause. Although DHEC does not assert that these provisions are constitutional, it maintains that Chambers lacked standing to challenge them.

■ In order to have standing a plaintiff must establish three elements:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (alteration in original) (citations, internal quotation marks, and footnote omitted). The party seeking to establish standing carries the burden of demonstrating these elements. *Id.*

### A.

■ Aside from listing the generator fees provision in its statement of the issue challenging Chambers' standing, DHEC elected not to advance any argument concerning why the district court erred in concluding that Chambers had standing to raise the constitutionality of the generator fees provision. We agree with the district court that Chambers demonstrated that it has standing to assert this claim and accordingly affirm on its reasoning. *Chambers Medical Techs. of S.C., Inc.,* 841 F.Supp. at 1408.

19. The blacklisting provision provides:

It is unlawful for a person who owns or operates a waste treatment, storage, or disposal facility within this State to accept any infec-

### B.

■ The blacklisting provision makes it unlawful for the owner or operator of a waste treatment facility within South Carolina to accept infectious waste generated in a jurisdiction which prohibits by law the treatment, storage, or disposal of that infectious waste within that jurisdiction. DHEC argues that because no states presently have prohibited the treatment, storage, or disposal of infectious waste, Chambers has suffered no injury from the blacklisting provision, nor is any injury likely—so any potential for harm to Chambers is too speculative to give rise to injury in fact. Thus, DHEC contends, Chambers has suffered no injury in fact sufficient to confer standing to challenge the constitutionality of the blacklisting provision.

■ In order to satisfy the Article III requirement that a plaintiff has suffered injury in fact, "[t]he plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." *Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (internal quotation marks omitted). Thus, an injury that is sufficiently threatened may constitute injury in fact.

Chambers accepts infectious medical waste from 16 states, and the district court found that although none of these states had presently adopted legislation that would bring the blacklisting provision into play, Chambers would incur costs associated with monitoring the laws of these states to ensure that they did not enact such legislation. *Chambers Medical Techs. of S.C., Inc.,* 841 F.Supp. at 1407. Importantly, Chambers' standing does not rest on the threat, as DHEC suggests, that it may become subject to the blacklisting provision at some unspecified date in the

tious waste generated in a jurisdiction which prohibits by law the treatment, storage, or disposal of that infectious waste within that jurisdiction.
S.C.Code Ann. § 44–93–110.

**1266**

future if and when another state takes some action. Rather, Chambers demonstrated that it will incur costs in monitoring the laws of other states so that it may avoid violation of the provision. We conclude that this present threat of injury is sufficiently concrete to provide injury in fact and affirm the decision of the district court with respect to Chambers' standing to challenge the blacklisting provision.

### VI.

In conclusion, we affirm the decisions of the district court that the fluctuating treatment cap does not violate the Equal Protection Clause, that the refrigeration provision violates the Commerce Clause, and that Chambers has standing to challenge the constitutionality of the blacklisting and generator fees provisions.

However, we must remand the question of the constitutionality of the fluctuating treatment cap under the Commerce Clause to the district court for further proceedings because we are unable to determine on the present record which level of scrutiny to apply.

*AFFIRMED IN PART; REMANDED IN PART.*